# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Bennett Street Properties, L.P.,

                Plaintiff,

                        Case No. 1:22-cv-940-MLB

v.

The Cincinnati Insurance
Company,

                Defendant.

_____/

## OPINION & ORDER

Plaintiff Bennett Street Properties, L.P., sued Defendant Cincinnati Insurance Company, claiming Defendant breached an insurance contract between the parties by initially denying Plaintiff's claim for a partial roof collapse and then refusing to pay sufficient amounts to replace the property. (Dkt. 6.) Plaintiff also claims Defendant acted in bad faith. (*Id.*) Defendant moves for summary judgment. (Dkt. 72.) Plaintiff opposes. (Dkt. 78.) The Court grants Defendant's motion.

## I.    Background[1]

Defendant issued Plaintiff an insurance policy on a multi-unit commercial building.  (Dkt. 78-1 ¶ 2.)  The policy provides that, in the event of loss or damage, Plaintiff may recover either the Actual Cash Value ("ACV") or the "Replacement Cost" ("RCV") of the building.  ACV is calculated as the "replacement cost less a deduction that reflects depreciation, age, condition, and obsolescence." (*Id.* ¶ 11.)  The policy establishes ACV as the default valuation, but Plaintiff may recover "Replacement Cost (without deduction for depreciation)" if certain conditions are met.  (Dkt. 6-1 at 44, 47.)  Specifically:

---

[1] The Court uses the parties' proposed facts and responses as follows. When a party does not dispute the other's fact, the Court accepts it for purposes of summary judgment and cites the proposed fact and corresponding response.  When one side admits a proposed fact in part, the Court includes the undisputed part.  When one side denies the other's proposed fact in whole or in part, the Court reviews the record and determines whether a factual dispute exists.  If the denial lacks merit, the Court deems the fact admitted so long as the record citation supports it. If a fact is immaterial, it is excluded.  If a fact is stated as an issue or legal conclusion, it is excluded.  *See* LR 56.1(B)(1)(c).  Where appropriate, the Court modifies one party's fact per the other's response when the latter better reflects the record.  Finally, as needed, the Court draws some facts directly from the record.  *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

[Defendant] will not pay on a replacement cost basis for any 'loss':

(1) Until the lost or damaged property is actually repaired or replaced with other property of generally the same construction and used for the same purpose as the lost or damaged property; and

(2) Unless the repairs or replacement have been completed or at least underway within 2 years following the date of 'loss';

(Dkt. 78-1 ¶ 12.)

On May 14, 2019, Plaintiff submitted a claim under the policy for a "partial roof collapse" (Claim No. 3344960). (*Id.* ¶ 3.) Defendant hired Robert Edmondson, an engineer, to inspect the building and determine the cause of the loss. (*Id.* ¶ 4; Dkt. 82 ¶ 9.) In June 2019, Edmondson issued a report, concluding the roof collapse was caused by ponded rainwater attributable to deficiencies in the construction or design of the roof slopes, possible deficiencies in the construction or design of the roof drainage system, and a lack of maintenance of the roof drains in the northwest and southwest corners. (Dkts. 72-4 at 31; 78-1 ¶ 6; 82 ¶ 8.)[2]

_____

[2] Defendant repeatedly objects to several factual assertions in Plaintiff's statement as "not authenticated" but does not support its objections with authority or developed argument. (*See, e.g.*, Dkt. 82 ¶¶ 8–9, 11–12, 15–16, 19–23, 35.) Those objections are forfeited, and the Court

On June 26, 2019, Defendant's counsel issued a letter to Plaintiff explaining Defendant "[wa]s not in a position to provide coverage" for Claim No. 3344960. (Dkt. 78-1 ¶ 7.) Counsel reiterated Edmondson's conclusion that ponded water from the design, construction, and maintenance deficiencies caused the damage. Counsel explained that improper design, construction, and maintenance were excluded under the policy unless they resulted in a covered cause of loss. (Dkt. 78-4 at 84.)

Counsel then explained "the roof caving [at issue here] was not a covered cause of loss"—meaning "there [wa]s no coverage for the faulty design or construction of the roof slopes, or the roof drainage system." (*Id.*) Counsel—citing the policy's coverage extension—explained that the policy defines a "collapse" as "an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose." (*Id.* at 85.) Counsel explained, however, that "a building that [wa]s standing or any part of a building that [wa]s standing is not considered to be in state of

---

disregards them. *NLRB v. McClain of Ga., Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998) ("Issues raised in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived.").

collapse" even if the building "ha[d] separated from another part of a building or shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinking or expanding." (*Id.*) Counsel stated "[i]t [wa]s [Defendant's] understanding that the building simply suffered a caving-in of the roof, but that the walls and other parts of the roof [we]re still intact." (*Id.*)

Plaintiff refuted this position. (Dkt. 78-1 ¶ 8.) On August 15, 2019, Defendant sort of reversed its position that the loss was not a covered loss. (*Id.*) It issued a letter to Plaintiff, stating it would move forward with adjusting Claim No. 3344960 but would reserve its rights as to issues of applicable exclusions to coverage under the policy, including the "faulty maintenance" and "collapse" exclusions. (*Id.*; Dkt. 78-4 at 87–92.) Michael Myers, a regional property claim manager with Defendant, explained Defendant rescinded the denial because it "gave the insured the benefit of the doubt." (Dkt. 72-5 at 3.) Defendant then retained Grecco Construction Consultants ("GCC") to re-inspect the building and

prepare estimates for the damage.  (Dkts. 78-1 ¶ 9; 82 ¶ 13.)[3]  Plaintiff also hired a contractor, John Hunter, to estimate the damage.  (Dkt. 82 ¶ 15.)

GCC and Hunter prepared various estimates, but the Court discusses only those relevant here.  In February 2021, Hunter gave a RCV estimate of $3,624,177 for building repairs (including labor, material, subcontractors, equipment, fees, surety bond, and other costs).[4] (Dkt. 78-6 at 88–101.)  In May 2021, GCC gave a RCV estimate of $2,110,288.04 and—less depreciation, which was line-item calculated per material—an ACV of $1,859,160.74.  (Dkt. 72-12 at 4–41.)  In September 2021, Hunter provided a new RCV estimate of $3,659,690 for building repairs (for labor, material, subcontractors, equipment, fees, surety bond, contingency, and other costs).  (Dkt. 78-6 at 102–12.)

To date, Defendant has paid Plaintiff an ACV of $1,861,160.74 for the building damages and $313,417 for business income damages.

---

[3] GCC completed an initial estimate but eventually learned in "late 2019" that the building would have to be torn down and rebuilt.  (Dkts. 78-1 ¶ 14; 78 at 11.)

[4] Hunter's estimate does not specify "RCV," but the parties agree that he estimated RCV amounts.  (*See, e.g.*, Dkt. 78-1 ¶¶ 23, 42.)

(Dkt. 78-1 ¶ 18.)  Plaintiff tore down the property but has not started reconstruction, claiming it does not have the money to do so.  (Dkts. 72-6 at 5; 72-9 at 8–9.)

On January 3, 2022, Plaintiff served a demand on Defendant for an additional payment of $1,913,390.49 that it said was necessary to settle the claim.  (Dkt. 6-2 at 2–3.)  More specifically, the letter demanded Defendant pay "the actual cash value of the additional $1,913,390.49" that it outlined in a spreadsheet.  (Dkt. 78-1 ¶ 19.)  Plaintiff's calculation and explanation of that demand are hard to follow.  While Plaintiff demanded an "[ACV] of the additional $1,913,390.49," the spreadsheet only referenced GCC's and Hunter's RCV numbers.  (*Id.* ¶ 23.)  The spreadsheet then calculated the difference between Hunter's September 2021 RCV ($3,659,690) and GCC's May 2021 RCV ($2,110,288)—$1,549,402.  (Dkt. 6-2 at 4.)  Plaintiff then apparently reduced that number by the $476,206 that Hunter included in his RCV estimate—but Plaintiff acknowledged were improperly included as "Code Items"—and by $147,692 that Hunter had also included—but that Plaintiff agreed should not be included because they were "Upgrades" to

the building so Plaintiff could include a third floor in the building.[5]  (*Id.*)

Plaintiff explained it was replacing its initial request for cost of the "Code

Items" with a demand for $450,000 of "code coverage" permitted under

the policy.  (*Id.*)  With an allowance for demolition costs, Plaintiff referred

to the new balance as the "Net Difference Between Estimates."   (*Id.*)

Plaintiff provided the following calculation:

| | | |
|---|---|---|
| Hunter Estimate (Hard Pricing from Subs, actual bid) | $ | 3,659,690.00 |
| Grecco Insurance RCV Model | $ | 2,110,288.00 |
| Difference | $ | 1,549,402.00 |
| Less Code Items | $ | 476,206.29 |
| Less Upgrades | $ | 147,692.48 |
| Difference net of Code & Upgrades | $ | 925,503.24 |
| Work Already Completed | $ | 139,370.00  (Demolition) |
| **Net Difference Between Estimates** | **$** | **786,133.24** |

(*Id.*)

Plaintiff then added the "code coverage" (referred to as "Max Code

Coverage") and the Net Difference Between Estimates to GCC's

May 2021 RCV estimate, shown in the following summary section:

---

[5] Analysis of Hunter's estimate and the spreadsheet confirms the Court's conclusion that Plaintiff remove $476,206.29 and $147,692.48 from Hunter's estimate after conceding the "Code Items" and "Upgrades" were not permitted by the policy.  The spreadsheet documents the removal of line items, all of which are traceable to Hunter's estimate.  (*See* Dkts. 6-2 at 4; 78-6 at 103–11.)

8

| Summary: | | | | |
|---|---|---|---|---|
| Grecco Base | $ | 2,110,288.00 | | |
| Max Code Coverage | $ | 450,000.00 | | |
| Net Differences Between Estimates | $ | 786,133.24 | | |
| Less Upgrade Items | $ | (147,692.48) | | |
| | | | | |
| Adjusted claim amount | $ | 3,198,728.76 | | |
| Funds in Wells Fargo ESCROW | $ | 1,282,428.58 | | |
| Remaining in BST ESCROW | $ | 111,214.81 | **With Inflation Contingency** | Materials Inflation % |
| **Additional payment needed to settle claim** | **$** | **1,805,085.37** | **$                1,913,390.49** | 6% |

(*Id.* at 5.)  This final math is particularly hard to understand.  The Court cannot, for example, divine why Plaintiff—having just removed the "Upgrades" in calculating the "Net Difference Between Estimates"—then included another deduction for those same upgrades.  But Plaintiff's goal was clear: to re-shuffle amounts and demand payment based on Hunter's RCV by starting with GCC's RCV estimate, adding the "Net Difference Between Estimates" and code coverage, and subtracting the costs Plaintiff now agreed were improperly included in Hunter's estimate.

On March 4, 2022, Defendant's counsel responded that it was not in a position to accept Plaintiff's demand.  (Dkt. 72-15 at 1.)  Counsel explained that, while Plaintiff's demand included $450,000 for code coverage, the policy required Plaintiff to incur those costs before collecting them and Plaintiff had provided "no indication that a single dollar of these costs ha[d] been incurred."  (*Id.* at 1–2.)  Counsel also explained that, while Plaintiff alleged GCC underestimated costs by $786,133.24, Plaintiff had provided "no reason to believe" GCC's estimate

was wrong or any document to explain "exactly where these additional costs ar[o]se from." (*Id*. at 2.) Counsel concluded by stating Defendant had paid the costs it reasonably believed it owed Plaintiff. (*Id*.)

Plaintiff filed suit three days later. (Dkts. 1, 6.) It claims Defendant breached the parties' insurance contract by (1) originally denying coverage, (2) refusing to pay the ACV for the damages, and (3) refusing to pay the RCV for the damages. (Dkt. 6 ¶¶ 36, 38.) It also claims Defendant denied the claim and refused to pay ACV in bad faith. (*Id*. ¶¶ 41–45.) Defendant moves for summary judgment. (Dkt. 72.) Plaintiff opposes. (Dkt. 78.)

## II.   Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the

applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party's burden is discharged merely by "showing—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325 (internal quotation marks omitted). In determining whether the moving party has met this burden, the district court must "view the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citation omitted). Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). All reasonable

doubts should be resolved in the favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). When the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine [dispute] for trial." *Id.* (citations omitted).

## III. Discussion

### A. Breach of Contract

The elements of a breach of contract claim are "(1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *UWork.com, Inc. v. Paragon Techs., Inc.*, 321 Ga. App. 584, 590 (2013) (citing *Norton v. Budget Rent A Car Sys.*, 307 Ga. App. 501, 502 (2010)). "A breach occurs if a contracting party repudiates or renounces liability under the contract; fails to perform the engagement as specified in the contract; or does some act that renders performance impossible." *Moore v. Lovein Funeral Home, Inc.*, 358 Ga. App. 10, 12 (2020); *see also Bd. of Regents of the Univ. Sys. of Ga. v. Doe*, 278 Ga. App. 878, 887 (2006) ("A breach of contract may arise in any one of three ways, namely: by renunciation of liability under the contract; by failure to perform the engagement; or by doing something which renders performance impossible.").

As a general matter, "an insurance policy is a contract, and the insured must comply with the terms of the policy to recover." *D-4 Men, Inc. v. Allstate Ins. Co.*, 2010 WL 11508336, at \*3 (N.D. Ga. Mar. 15, 2010).  This means that "[c]ompliance with the policy provisions is a condition precedent to recovery." *Suntrust Mortg., Inc. v. Ga. Farm Bureau Mut. Ins. Co.*, 203 Ga. App. 40, 42 (1992); *see also Marchman v. Grange Mut. Ins. Co.*, 232 Ga. App. 481, 483 (1998) ("When a plaintiff's right to recover on a contract depends upon a condition precedent to be performed by him, he must allege and prove the performance of such condition precedent, or allege a sufficient legal excuse for its nonperformance.").

### 1. Denial

Plaintiff alleged Defendant breached the policy when it initially denied Plaintiff's claim and "caused unreasonable delay and increased cost of repairs to the insured premises."  (Dkt. 6 ¶ 37.)  Defendant says Plaintiff has no evidence of any damage it suffered from Defendant's initial denial of the claim.  (Dkt. 81 at 5.)  The Court agrees.  The delay lasted from June 26, 2019 (when Defendant denied the claim) until August 15, 2019 (when Defendant issued the reservation of rights

letter)—a period of 51 days. Plaintiff's statement of additional material facts identifies no evidence that material costs went up during that time, that labor rates increased during the delay, or that the cost of construction increased in any other way from Defendant's initial decision to deny Plaintiff's claim. (*See* Dkt. 78-2.)

Admittedly, Plaintiff's amended complaint refers to lost business income (specifically, two years of lost rental income). (Dkts. 6 ¶ 39; 82 ¶¶ 11–12.) It is unclear whether these alleged damages arose from Defendant's initial denial of the claim or Defendant's alleged failure to pay the amount Plaintiff demanded. Plaintiff's complaint muddles the issues. (Dkt. 6 ¶¶ 37–39.) In any event, Defendant paid Plaintiff's claim for lost business income, and Plaintiff fails to otherwise show that payment was insufficient. (Dkt. 72-1 at 16–17; 78-1 ¶ 18.) Plaintiff's representatives (its owner and property manager) testified that they did not know how much additional lost business income Plaintiff was seeking. (Dkts. 72-6 ("Q: [] Are you making an additional loss of business income claim in this lawsuit? A: I would hope so. Q: Okay. For what period of time? A: I don't know."); 72-9 at 5 ("Q: Do you have any documentation showing what you're claiming in [business income] that

has not been provided?  A: Not that has not already been provided")).[6]

Establishing damages is an essential element of a breach-of-contract

claim under Georgia law.    *UWork.com, Inc.*, 321 Ga. App. at 590.

Accordingly (and without concluding Defendant's initial denial

constituted a breach of the policy), Plaintiff provides no evidence of these

additional damages during the 51-day delay, and the Court grants

Defendant summary judgment on Plaintiff's breach-of-contract claim

related to Defendant's original denial of Claim No. 3344960.

### 2.    ACV

Defendant moves for summary judgment on Plaintiff's ACV claim,

arguing Plaintiff "seems to conflate a claim for RCV with a claim for ACV

of real property, making a claim for the former (RCV), when only entitled

to a claim for the latter (ACV)."  (Dkt. 72-1 at 7.)  Defendant says this

---

[6] Plaintiff says in its response that it is entitled to additional payments
for lost business income *beyond* the 18 months provided in the policy.
This does not appear to be connected to Defendant's initial denial.  In any
event, Plaintiff provides no basis for the Court to conclude that Plaintiff
is entitled to such payments. (Dkts. 78 at 22–23; 78-2.)  At most, Plaintiff
appears to reference a portion of the policy as a basis for the first time in
its brief, which the Court will not consider.  (Dkt. 78 at 6–7); N.D. Ga.
L.R.  56.1(B)(2)(b).  Accordingly, the Court grants Defendant summary
judgment on any claim for lost rental income.

confusion is clear in Plaintiff's demand letter because it demanded Defendant pay the "[ACV] of the additional $1,913,390.49" but attached a spreadsheet that referenced only RCV numbers. (*Id.*; Dkt. 6-2.) Plaintiff says it has "always contended that the ACV payment has been inadequate," citing its demand letter, amended complaint, and testimony from its property manager saying the same. (Dkt. 78 at 20.) The Court concludes Plaintiff has failed to create a genuine issue of material fact as to whether Defendant breached the policy by paying an improper ACV.

Defendant hired GCC, who estimated an ACV of $1,859,160.74. (Dkt. 72-12 at 4–41.) Defendant paid a little over this amount. (Dkt. 78-1 ¶ 18.) Plaintiff presents no evidence it ever provided Defendant any alternative ACV calculation. Indeed, Plaintiff admits its demand letter sought more money for "actual cash value" or the "actual cash value of the loss based on the actual replacement cost" but wholly derived its demand from RCV numbers. (*Id.* ¶ 23; Dkt. 6-2 at 2.) In other words (and as discussed above), Plaintiff demanded payment of Hunter's RCV (less admitted improper costs) but called it "the actual cash value." (Dkt. 6-2 at 2–6.) Titles don't matter. Plaintiff was seeking the cost needed to reconstruct its building—that is, the RCV. As discussed below,

Plaintiff is not entitled RCV unless it complies with the condition precedent in the policy, which occurs when the building is "actually repaired or replaced." (Dkt. 78-1 ¶ 12.)

Plaintiff says it is "disingenuous" for Defendant to argue that it could not calculate the ACV from its demand figure and that it was "easy to compute." (Dkt. 78 at 21–22.) Though Plaintiff does not argue it so elegantly, Plaintiff appears to assert that a dispute over an RCV necessarily implicates an ACV dispute. Plaintiff's problem is that, while RCV and ACV are related, they are distinct values under the plain language of the policy—RCV does not include a deduction for depreciation. (Dkt. 6-1 at 47.) That is why GCC provided two different values in its estimate. Neither Hunter's September 2021 estimate nor Plaintiff's spreadsheet provided a depreciation value to calculate ACV. (Dkts. 78-6 at 102–12; 6-2 at 4–6.) Nor has Plaintiff pointed the Court to *record evidence* that supports a depreciation value for Hunter's September 2021 estimate. (Dkt. 78 at 22); *Predelus v. Atain Specialty Ins. Co.*, 2023 WL 1331229, at *6 (S.D. Fla. Jan. 31, 2023) ("While it is true that [ACV] is calculated by subtracting depreciation from [RCV], there is no evidence in the record of depreciation. Accordingly, Plaintiff

17

would be unable at trial to establish [ACV].").  Instead, Plaintiff suggests using what it says was GCC's May 2021 depreciation value—11.9%. (Dkts. 78 at 22; 82 ¶ 36.)  Plaintiff says the calculation goes like this: use "the only agreed RCV in this case"—Hunter's February 2021 estimate of $3,624,177—minus $335,000 for non-covered code items, minus 11.9% depreciation, resulting in an ACV of $2,184,154.94.[7]  (Dkts. 78 at 22; 82 ¶ 36.)

The Court rejects Plaintiff's suggestion for a few reasons.  First, GCC did not use an overall depreciation value; it used line-item depreciation values depending on the type of material.   (Dkt. 72-12 at 4–41.)  Second, Plaintiff offers no legal authority suggesting the Court can merely tack GCC's depreciation value onto Hunter's proposed RCV. The Court will not draw such an unreasonable inference.  *Turkmany v. Excelsior Ins. Co.*, 2014 WL 3556390, at *3 (D.N.J. July 18, 2014) (declining to apply the defendant's proffered depreciation value to the

---

[7] This is an odd argument by Plaintiff.  For one thing, Plaintiff bases its entire RCV breach-of-contract claim on a lack of an agreed-upon RCV. For another, Plaintiff's demand letter and spreadsheet used Hunter's September 2021 estimate, not his February 2021 estimate.  (Dkts. 6-2 at 4; 78-6 at 112.)

plaintiff's different, larger RCV). Third, Plaintiff offers no record evidence discussing the similarities between the two estimates such that the Court could conclude, for example, that GCC and Hunter were talking about the same items to rebuild the property but just different prices. Plaintiff's counsel merely asserts Defendant should have (and the Court could) apply GCC's depreciation value. (Dkt. 78 at 22.)

The bottom line is that Plaintiff's demand letter and spreadsheet included an RCV without any depreciation value, which is not a measure of ACV under the policy's terms. Though Plaintiff suggests Defendant should have pulled out its calculator and tried to glean an ACV from Plaintiff's demand and spreadsheet, Defendant—like the Court—was stuck with the static (and confusing) documents Plaintiff presented. Plaintiff cannot now morph those documents into something they weren't. Plaintiff has failed to show a disputed ACV and has thus failed to raise a genuine issue of material fact as to Defendant's alleged breach of contract for failure to pay ACV. The Court grants Defendant summary judgment on this claim.

### 3.    RCV

Defendant argues Plaintiff's claim for RCV must fail because it has not repaired or replaced the allegedly damaged property.  (Dkt. 72-1 at 8–15.)  The Court agrees.

The insurance policy says Defendant will not pay a claim for RCV "[u]ntil the lost or damaged property is actually repaired or replaced with other property of generally the same construction and used for the same purpose as the lost or damaged property" and "[u]nless the repairs or replacement have been completed or at least underway within 2 years following the date of 'loss.'"  (Dkt. 78-1 ¶ 12.)  The "until and unless" provision is plain and unambiguous.  It means Defendant is not obligated to pay Plaintiff the RCV until Plaintiff actually makes the repairs and incurs the costs of doing so.  Plaintiff admits it has not done this.[8]  The

---

[8] Plaintiff says it "performed mold remediation of the building and then demolished the building when it could not be rebuilt."  (Dkt. 78-1 ¶ 30.)  Plaintiff's point is unclear.  Plaintiff certainly does not argue it has complied with the condition precedent of reconstruction within two years.  (*See* Dkt. 78.)  Nor could Plaintiff, as it says it cannot replace the building until Defendant provides the RCV funds.  (*Id.* at 19.)  Plaintiff thus provides no evidence it performed under the policy.  *See Alexander v. TFM Boral Brick, Inc.*, 2008 WL 4951240, at *3 (M.D. Ala. Nov. 19, 2008) ("The party opposing summary judgment must respond by setting forth specific evidence in the record and articulating the *precise manner in*

failure to satisfy this condition precedent is fatal to Plaintiff's claim. *Marchman*, 232 Ga. App. 481, 483 ("The contract clearly requires, as conditions precedent to receiving benefits under the replacement cost rider, that Marchman (a) rebuild his home and (b) pay additional premiums. . . . It is undisputed that Marchman has not rebuilt the home or paid the additional premiums. . . . Accordingly, Marchman failed to present any evidence to create a material issue of fact regarding his performance of the conditions precedent and his entitlement to benefits under the replacement cost rider."); *see also Riverside Apartments of Cocoa, LLC v. Landmark Am. Ins. Co.*, 505 F. Supp. 3d 1293, 1310 (M.D. Fla. 2020) (applying Georgia law, relying on *Marchman*, and holding the same); *Elder v. State Farm Fire & Cas. Co.*, No. 2021 WL 4048789, at *7 (N.D. Ga. Aug. 2, 2021) (same).

Plaintiff says it is excused from the condition precedent because Defendant failed to obtain an agreed-upon RCV from a contractor.[9]

---

*which that evidence supports [its] claim*, and [may] not rest upon the mere allegations or denials of the pleadings." (emphasis added)).

[9] The parties dispute whether Hunter and GCC ever agreed on a proposed number. Defendant says, at one point, they did—apparently an estimate that Hunter completed in November 2020 and that GCC used the next

(Dkt. 78 at 14–15, 18–20.)  Plaintiff first (albeit, only in its fact section)

points to the policy's "cost to replace" language, arguing that such amount

cannot be determined until someone has agreed to replace the property

for that amount.  (*Id.* at 5.)  The policy provides:

> [Defendant] will not pay more for 'loss' on a replacement cost
> basis than the least of:
>
> (1) The Limit of Insurance applicable to the lost or
>     damaged property;
>
> (2) The cost to replace, on the same 'premises', the lost
>     or damaged property with other property:
>         a. Of comparable material and quality; and
>         b. Used for the same purpose or
>
> (3) The amount you actually spend that is necessary
>     to repair or replace the lost or damaged property.

(Dkt. 78-1 ¶ 12.)  No part of this requires Defendant and Plaintiff to agree

on a RCV before the property is "actually repaired or replaced."  This

---

month in its software. (Dkts. 78-1 ¶ 15; 82 ¶¶ 15, 22.)  It also says Hunter
later backtracked on his agreement.  (Dkt. 78-1 ¶ 17.)  Plaintiff disputes
this by arguing Hunter's estimate was based on projected numbers and
preliminary drawings and that a contractor never agreed to GCC's RCV
values.  (*Id.* ¶¶ 15–17; Dkt. 82 ¶¶ 15–24.)  As discussed below, whether
Hunter and GCC ever agreed on a number is immaterial because nothing
in the policy requires Defendant to obtain an agreed-upon RCV before
Plaintiff must comply with the condition precedent in the policy.  The
Court thus assumes (without deciding) the parties did not agree on an
RCV.

merely sets an upper limit on what Defendant pays once Plaintiff complies with the condition precedent.

Plaintiff also argues Defendant "knew [] it should obtain an agreed estimate from a contractor to determine RCV." (Dkt. 78 at 18–19.) As support, it cites testimony from Karen Roop, a headquarter supervisor for property claims with Defendant, that it is "preferred" to get an agreed-upon RCV with a contractor when adjusting a property loss. (Dkts. 78-3 at 4, 12; 82 ¶ 26.) It also cites Myers's testimony that Defendant "always tr[ies] to" get an agreement with the contractor on RCV. (Dkts. 78-12 at 9–10; 82 ¶ 26.) None of this testimony shows that Defendant is required to get an agreed-upon RCV before Plaintiff can act under the policy; it merely shows that, as a matter of practice, Defendant tries to do so.

Plaintiff otherwise points to nothing in the policy or Georgia law that required Defendant to agree on RCV prior to Plaintiff rebuilding the property. The step Plaintiff seeks to impose is simply not in the policy. In the absence of Plaintiff having satisfied the condition precedent, all the policy requires Defendant to do is pay ACV, and—as discussed above—Plaintiff has failed to show any breach in that regard. *See*

23

*Riverside*, 505 F. Supp. 3d at 1313 (M.D. Fla. 2020) (explaining that an insured could recover RCV if they could prove that: (1) the insurer breached the contract by failing to remit the full ACV under the policy, (2) the insured was unable to perform because the insurer's breach denied them the funds necessary to repair the damaged property, and (3) the insured would have repaired the damaged property but for the insurer's breach).  Plaintiff has thus failed to raise a genuine issue of material fact as to Defendant's alleged breach of contract for failure to agree on and pay the RCV.  The Court grants Defendant summary judgment on this claim.

## B.    Bad Faith

O.C.G.A. § 33-4-6 is the "exclusive remed[y] for an insurer's bad faith refusal to pay insurance proceeds."  *Howell v. Southern Heritage Ins. Co.*, 448 S.E.2d 275, 276 (Ga. Ct. App. 1994) (citing *McCall v. Allstate Ins. Co.*, 310 S.E.2d 513, 516 (Ga. 1984)).  To prevail under the statute, an insured must show: (1) the claim is covered under the insurance policy; (2) the insured made a demand for payment against the insurer at a time when the claim was payable and at least 60 days before filing suit; and (3) the insurer's failure to pay was motivated by bad faith.

24

*BayRock Mortg. Corp. v. Chicago Title Ins. Co.*, 648 S.E.2d 433, 435 (Ga. Ct. App. 2007).

"The insured bears the burden of proving bad faith, which is defined as any frivolous and unfounded refusal in law or in fact to comply with the demand of the policyholder to pay according to the terms of the policy." *Ga. Farm Bureau Mut. Ins. Co. v. Williams*, 597 S.E.2d 430, 432 (Ga. Ct. App. 2004) (internal quotation marks and citation omitted). Accordingly, "[p]enalties for bad faith are not authorized where the insurance company has *any* reasonable ground to contest the claim and where there is a disputed question of fact." *S. Fire & Cas. Ins. Co. v. Nw. Ga. Bank*, 434 S.E.2d 729, 730 (Ga. Ct. App. 1993) (internal quotation marks and citations omitted) (emphasis added); *see also Montgomery v. Travelers Home & Marine Ins. Co.*, 859 S.E.2d 130, 135 (Ga. Ct. App. 2021) (summary judgment for insurer on bad faith is appropriate "unless there is evidence that the insurer 'had *no* reasonable grounds to contest [the insured's] claim [under the policy]'" (citation omitted) (emphasis and modifications in original)). "A defense going far enough to show reasonable and probable cause for making [a claim decision], would vindicate the good faith of the company as effectually as would a complete

defense to the action." *Rice v. State Farm Fire & Cas. Co.*, 430 S.E.2d 75, 78 (Ga. Ct. App. 1993) (internal quotation marks and citation omitted).

Plaintiff alleged Defendant acted in bad faith when it denied Plaintiff's claim and refused to pay the "full amount of the [ACV] of the repairs." (Dkt. 6 ¶¶ 41–42.) Defendant moved for summary judgment, arguing no evidence suggests it acted in bad faith in denying Plaintiff's ACV demand because it has paid $1,861,160.74 (which it claims to be the full ACV due). (Dkt. 72-1 at 18–19.) Plaintiff offered no argument or evidence in opposition. The Court thus concludes Plaintiff forfeited that claim.[10] (Dkt. 78 at 23–26); *see Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001) (finding claim abandoned and affirming grant of summary judgment as to claim presented in complaint but not raised in initial response to motion for summary judgment). As a result, the Court considers the two bad-faith arguments Plaintiff included in opposition to summary judgment: that Defendant acted in bad faith by

---

[10] In any event, as discussed above, Plaintiff failed to show any breach related to Defendant's failure to pay additional amounts for ACV, and Plaintiff's claim for bad faith in this regard thus fails. *BayRock Mortg. Corp.*, 648 S.E.2d at 435 (explaining that the insured must show, among other things, that the claim is covered).

initially denying Plaintiff's claim and by "failing to [c]alculate RCV by [g]etting an [a]greed [e]stimate." (Dkt. 78 at 23–26.)

### 1.   Denial of Coverage

Plaintiff says Defendant acted in bad faith when it initially denied Plaintiff's claim without any reasonable basis. (*Id.* at 23.) Defendant says this claim fails because it reversed its denial long before Plaintiff sent its demand letter. (Dkt. 81 at 9.) The Court agrees with Defendant.

As discussed above, Defendant reversed its position and reserved its rights 51 days after it initially denied Plaintiff's claim. Plaintiff presents no evidence that it made any demand during that time. Even if Plaintiff had, its claim would still fail because Defendant reversed its position with the 60-day period, and it was not unreasonable for Defendant initially to deny the claim in reliance on Edmondson's findings. *See Johnston v. Companion Prop. & Cas. Ins. Co.*, 318 F. App'x 861, 868 (11th Cir. 2009) (affirming summary judgment on bad faith claim were insurer "had a legitimate, although ultimately unsuccessful, challenge to [the insured]'s claim"). Additionally, Plaintiff's January 3, 2022 demand letter was unrelated to Defendant's initial denial, as it related to Defendant's alleged failure to pay additional

amounts for ACV (really, RCV). Admittedly, Plaintiff's demand letter alleged that the parties dispute over the "actual cash value" or replacement costs "[wa]s a direct result of the bad faith denial of coverage" and that the delay "that followed that bad faith denial of coverage" was "at the core of this dispute." (Dkt. 6-2 at 2–3.) But Plaintiff's spreadsheet did not specify any cost attributable to the delay (like an increase on labor or materials as a result of the 51-day denial).[11] The demand letter arose out of a dispute over the amount Defendant was required to pay under the policy—what Plaintiff called ACV—and not because of the initial (and retracted) denial. The Court will not read into Plaintiff's letter a demand or requests that were not there. *Zurich Am. Ins. Co.*, 136 F. Supp. 2d 1340, 1356 (N.D. Ga. 2001) ("Although no particular language is required, the language used [in the demand for payment] must be sufficient to alert the insurer that a bad faith claim

---

[11] In the spreadsheet's section related to "Code Items" and "Upgrades," Plaintiff notes one cost ($5,397) for "[a]dditional management labor attributed to code[-]related delays[.]" (Dkt. 6-2 at 4.) Nothing in the demand letter or spreadsheet ties this cost to the 51-day delay. And, as discussed above, Plaintiff subtracted this amount and others for "Code Items" that were improperly included in Hunter's estimate.

28

will be asserted *if the specific loss noted is not paid*." (emphasis added)).

Plaintiff's bad-faith claim related to Defendant's initial denial fails.

### 2. Failure to Calculate RCV

Plaintiff says Defendant acted in bad faith by "[f]ail[ing] to [c]alculate RCV by [g]etting an [a]greed [e]stimate. (Dkt. 78 at 24–26.) This argument fails as well. As an initial matter, Plaintiff did not allege Defendant acted in bad faith with regard to RCV in its complaint, and Plaintiff cannot amend its complaint via its response. (Dkt. 6 ¶¶ 40–46); *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a). A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."). In any event, as discussed above, nothing requires Defendant to agree upon a RCV in advance, and Defendant is not required to pay RCV because Plaintiff has not complied with the condition precedent. *BayRock Mortg. Corp.*, 648 S.E.2d at 435.

Accordingly, the Court grants Defendant summary judgment on Plaintiff's bad-faith claim related to RCV.

## IV. Conclusion

The Court **GRANTS** Defendant's Motion for Summary Judgment (Dkt. 72).  The Court **DIRECTS** the Clerk to close this case.

**SO ORDERED** this 6th day of September, 2024.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE